**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | |
|---|---|
| **UNUM LIFE INSURANCE COMPANY OF AMERICA** | **PLAINTIFF/COUNTER DEFENDANT** |
| VS. | 4:09CV00244-WRW |
| **WOOTEN EPES** | **DEFENDANT/COUNTER PLAINTIFF** |

<u>**ORDER**</u>

In this ERISA[1] case, Plaintiff Unum Life Insurance Company of America ("Unum") seeks to recover alleged overpayments made to Defendant Wooten Epes ("Epes").[2] Epes counterclaims for reinstatement of his benefits, and for back payments.[3] Pending are cross-Motions for Summary Judgment (Doc. Nos. 18, 22).[4]

Unum's Motion for Summary Judgment is GRANTED IN PART (because Unum properly terminated Epes's benefits) and DENIED IN PART (because Unum cannot recover the overpayments).

Epes's Motion for Summary Judgment is GRANTED IN PART (because Epes is entitled to keep all payments made by Unum), and DENIED IN PART (because Epes is not entitled to reinstatement or back benefits).

As a result, both the Claim and Counterclaim are DISMISSED with prejudice.

---

[1]29 U.S.C. § 1132, *et seq*.

[2]Doc. No. 1.

[3]Doc. No. 11.

[4]The parties have responded in Doc. Nos. 26 & 27. In addition to the materials on record, oral arguments were held on February 11, 2010 (Doc. No. 33).

**I.     BACKGROUND**

The following facts are undisputed.[5] Epes was a partner in the law firm Kutak Rock, LLP ("Kutak"). Kutak had a long-term disability benefits policy ("the Policy") issued by Unum. On or about September 16, 2004, Unum began paying benefits to Epes after he suffered a back injury. The Policy includes a benefits termination provision that reads: "[d]isability benefits will cease on . . . the date the insured's current earnings exceed 80% of his indexed pre-disability earnings."[6] The crux of this case is whether Epes began "earning" more than 80% of his pre-disability earnings when he began participating in various business ventures while receiving disability payments.

Unum required continuing proof of disability. The Policy states that "[p]roof of the insured's monthly earnings must be given to [Unum] on a quarterly basis," and that "[b]enefit payments will be adjusted upon receipt of this proof of earnings." In the course of conversations between Unum and Epes regarding proof of continuing disability, Epes disclosed, in or about 2004, that he was a partner in Edgewater Affordable Housing Limited Partnership ("EAH"). At that time, Epes said his business was earning some money. Epes claimed, however, that there was no net gain. Epes also said that at the end of four years he expected to earn what he had earned before making his disability claim.

On November 24, 2004, Epes provided Unum with a job description regarding EAH. Epes described the nature of the business as "real estate development" and listed himself as "co-owner." He described his duties as: "communicate via telephone and computer with partner and two

---

[5]See Doc. Nos. 20, 23, 25, 29, 30.

[6]Doc. No. 21.

employees about multifamily housing rental property acquisitions and sales." Epes indicated that he had not received any income from EAH.

As the result of this and other communications between Epes and Unum regarding EAH, Unum sent a field representative to interview Epes in person on June 26, 2005. During this interview, Epes represented that he had no earnings from his business. He said he hoped to work up to an annual profit of $250,000-$300,000 in the next five years. Following the field interview, over the next two months, Unum approved two more benefits payments to Epes.

The following month, on September 19, 2005, Epes submitted a Supplemental Claimant's Statement affirming that he was engaged in work activity for payment, which consisted of part-time work from his home in a real estate investment and development business.

On June 7, 2006, Epes submitted an updated Supplemental Claimant's Statement in which he reversed his previous statement, answering "no" to the question of whether he had been engaged in work activity for a profit. He wrote that he was "self employed – real estate investment business. I do not receive paychecks regularly. Do not expect to return to work."

Later, Epes provided Unum with his tax returns for 2004 and 2005. Unum argues that the 2004 return reflected a loss in "earnings" of - $158,481, and that the 2005 return reflected "earnings" of $221,373. Epes argues that the returns do not show "earnings," but instead show "income and losses calculated by defendant's CPA and according to the rules and regulations of the Internal Revenue Service."[7]

In July, 2007, Epes provided copies of his 2002 and 2003 tax returns. The returns were analyzed by a Unum financial consultant, who concluded that Epes would "likely" have an

---

[7]Doc. No. 29.

overpayment for the year 2006, and that 2007 "will be similar." A Unum representative called Epes on September 11, 2007, and the call notes from that conversation read:

> Noted to the claimant that we have reviewed the available financial records and note that it appears that the 2006 year will result in an overpayment. The claimant notes that to date, his 2006 taxes have not been completed but his extension is coming due soon. The claimant is going to forward these records to us when they become available. Reviewed that based on our initial calculations, we are going to begin offsetting his LTD benefits in the amount of $6700/mo. The claimant confirms his understanding and this will begin with the current month's benefit.

Epes now disputes that he was informed that the $6,700 per month offset was the result of overpayment.

Unum scheduled another in-home interview with Epes, which occurred on September 13, 2007. The interviewer's report from that meeting indicates that Epes advised Unum's representative that he had "made a lot of money" in 2006, and that he would forward his 2006 tax return when it was available.

On October 2, 2007, Unum produced a financial analysis based on Epes's 2002 through 2005 tax returns and information that Epes had provided. Unum's representative observed that "the Insured's duties and responsibilities within this business is one of real estate investor who oversees the development (rehabilitation) of the property." Based on that information, and on the information in Mr. Epes's tax returns, Unum concluded that, "it appears that the Insured is earning substantial income and the earnings are not passive. This may be earnings as defined in the contract."

On October 14, 2007, Epes sent Unum his 2006 tax return. Epes's return reported a total of $881,041 in "non-passive income." The 2006 tax return stated EAH had non-passive income of $785,563. Unum concluded that this non-passive income meant Epes was actively involved in running the business and that this income counted as "earnings" under the Policy.

4

Based on the information contained in Epes's 2006 tax return, Unum determined that Epes's earnings exceeded 80% of his pre-disability earnings no later than January 1, 2006. Additionally, Unum calculated overpayment of benefits in the amount of $253,050.83. Epes was informed of Unum's denial of benefits and the overpayment by letter dated December 14, 2007. In response to this letter, Epes sent Unum a letter requesting an explanation of the overpayment calculations. The parties disagree as to whether Epes's letter indicated a dispute over his denial of benefits or the claim of overpayment.

On January 11, 2009, Unum began efforts to collect on the alleged overpayment, including phone calls and letters requesting payment. Epes referred the matter to his lawyer. Unum asserts that, in a telephone conversation on March 4, 2008, Epes's lawyer agreed that there was an overpayment, but wanted to confirm that the overpayment amount was correct. Epes argues that this is not a "complete or accurate recitation of the conversation."[8] Either way, attorneys for Unum and Epes subsequently met and discussed calculation of the overpayment.

Following this meeting, Unum recalculated the overpayment as $207,894.88, and Unum's financial consultant explained the recalculation in her review of the financial information provided by Epes. Unum's counsel explained Unum's reasoning to Epes by letter dated February 12, 2009.

On April 1, 2009, Unum filed its Complaint to recover the overpayment. Unum's pending summary judgment motion argues that: (1) Epes was contractually ineligible for benefits as of January 1, 2006; and (2) Unum is entitled to equitable relief to recover overpayments made after that date, totaling $207,894.88.[9]

---

[8]Doc. No. 29.

[9]Doc. No. 18.

Epes counterclaimed, arguing that he continues to be entitled to benefits. Epes's pending summary judgment motion argues that: (1) Unum improperly terminated his benefits; (2) Unum cannot recover overpayments; and (3) Unum must reinstate Epes's benefits and pay him back benefits with interest.[10]

## II. DISCUSSION

### A. ERISA Claims

#### 1. ERISA Contract Interpretation: Unum's Denial of Epes's Benefits

The parties agree that the Policy does not give Unum discretionary review, so I review Unum's termination of Epes's benefits *de novo*.[11] I do so without deference to either party.[12]

"The federal courts apply federal common law rules of contract interpretation to discern the meaning of the terms in an ERISA plan . . . ," and under federal common law "a contract should be interpreted as to give meaning to all of its terms -- presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous."[13] I must give the ERISA policy language "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words."[14]

Unum terminated Epes's benefits based on the Policy's benefits termination provision, which reads: "[d]isability benefits will cease on . . . . the date the insured's current earnings exceed 80% of his . . . pre-disability earnings."[15] Epes argues that Unum improperly terminated

---

[10]Doc. No. 22.

[11]Doc. Nos. 19, 24; see *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

[12]See *Bruch*, 489 U.S. at 108.

[13]*Harris v. Epoch Group, L.C.*, 357 F.3d 822, 825 (8th Cir. 2004).

[14]*Halbach v. Great-West Life & Annuity Ins. Co.*, 561 F.3d 872, 877 (8th Cir. 2009).

[15]Doc. No. 21.

his benefits because Unum's use of his non-passive income to calculate his post-disability earnings is not authorized under the Policy, or, alternatively, that Unum calculated his earnings incorrectly in his case.[16]

### a.     Use of "Non-Passive Income" Was Proper Under the Policy

Epes first argues that the termination of his benefits was improper because the Policy does not specifically provide that Unum can calculate post-disability earnings based on non-passive income reported in tax returns. I disagree.

The Policy states that "[p]roof of the insured's monthly earnings must be given to [Unum] on a quarterly basis," and that "[b]enefit payments will be adjusted upon receipt of this proof of earnings."[17] The term "earnings" is used throughout the Policy consistent with "its common and ordinary meaning" of "money derived from one's own labor or active participation; earnings from services."[18] A reasonable person in the position of the policy participant, then, would understand that the Policy requires proof of money derived from his or her labor or services, and that Unum would use that proof to adjust benefit entitlements.[19]

As detailed above, at numerous points throughout Epes's dealings with Unum, he provided his federal tax returns as proof of his earnings.[20] Unum then used the portion of Epes's

---

[16] Doc. Nos. 24, 27.

[17] Doc. No. 21.

[18] *Black's Law Dictionary* 831 (Bryan A. Garner, ed., 2009); see also *Webster's Third New Int'l Dictionary of the English Language (unabridged)* 714 (1993) (defining "earnings" as "return for work done or services rendered: have accredited to one as remuneration").

[19] This interpretation is supported by another provision in the Policy that requires monthly disability benefits to decrease as the insured's post-disability earnings increase as a result of his or her "regular occupation or another occupation." Doc. No. 21.

[20] Doc. Nos. 21, 19, 24.

7

tax returns -- his non-passive income -- that best indicated Epes's "earnings" as that term is used in the Policy.[21]  Similarly, and in accordance with explicit language in the Policy, Unum determined Epes's pre-disability earnings based on the Kutak partnership's federal income tax return.[22]  Unum's use of tax report information to determine earnings under the Policy is consistent with the unambiguous language of the Policy.

### b.   Use of "Non-Passive Income" Was Proper in Epes's Case

Epes next argues that, even if Unum's use of his tax report information was not a violation of the Policy, Unum's use of non-passive income was incorrect in Epes's case.

Epes argues that almost all of his reported non-passive income was the result of his limited partnership status in the real estate business, EAH.  And, Epes contends that under the Tax Reform Act of 1986 ("the tax code"),[23] limited partners are, by definition, passive participants in their partnerships.  Since limited partners are passive participants under the tax code, Epes argues that the tax code undercuts Unum's conclusion that his non-passive income was "earnings" under the Policy.  I disagree.

First, even under the tax code, Epes's argument is not persuasive.  Epes cites various provisions of the tax code to describe how, in some cases, "non-passive activity may actually be the result of the taxpayer's passive participation as a limited partner in a limited partnership."[24]

---

[21]*Id.*

[22]The Policy actually reads in terms of "indexed pre-disability earnings," which are defined in the Policy as the insured's "basic monthly earnings," adjusted for inflation. Doc. No. 21.  As a lawyer and partner in a law firm, Epes's "basic monthly earnings" are his "'net earnings (loss) from self-employment' from schedule K-1 of the partnership federal income tax return for the calendar year just prior to the date disability begins."  See *Id.*

[23]26 U.S.C. § 469, *et seq.*

[24]Doc. No. 24.

8

But, the tax code contains numerous exceptions to this rule, providing that limited partners are, in fact, active participants in a business such as this.[25]  Epes neither mentions these exceptions nor provides evidence that the exceptions do not apply to his involvement in EAH.  In other words, even under the tax code, Epes has not demonstrated that he was only passively involved in EAH.

But, more importantly, the details of the tax code do not govern the Policy or the decisions Unum made about earnings.  Just because Unum used Epes's tax returns as proof of his "earnings" does not mean that I will now read the entire tax code into the Policy.  The Policy unambiguously provides that "[b]enefit payments will be adjusted upon receipt of . . . proof of earnings."[26]  Epes provided Unum proof representing that money derived from his labor or services far exceeded 80% of his pre-disability earnings.[27]  Here, Epes has provided no evidence demonstrating that he was not, in fact, earning over 80% of his pre-disability earnings.  The Policy clearly states that disability benefits "cease"  as of "the date the insured's current earnings exceed 80% of his . . . pre-disability earnings."[28]  Accordingly, Epes's benefits were properly terminated under the Policy.

Summary judgment is GRANTED in favor of Plaintiff, and DENIED against Defendant, on the question of whether Unum properly terminated Epes's benefits under the Policy.

---

[25] For example, if Epes had worked more than 500 hours in the taxable year, he could not claim the limited partner exception.  Similarly, if he had acted as a general partner (despite his title as a limited partner) in the taxable year, then he could not claim the limited partner exception. See 26 C.F.R. § 1.469-5T.

[26] Doc. No. 21.

[27] According to the Policy, Epes's benefits would terminate if his post-disability earnings exceeded approximately $22,000 per month (80% of his $28,573 pre-disability earnings), while his tax returns indicated an average of $73,668 per month of non-passive income.

[28] Epes has argued that the Policy should be read to terminate benefits only for any given month where post-disability earnings exceed pre-disability earnings by 80%.  The Policy, however, unambiguously reads that benefits "cease" whenever the specified condition exists.

9

### 2.     Epes's Claim for Benefits Reinstatement and for Back Benefits

Epes seeks reinstatement of his benefits, and back benefits with interest. However, the Policy's insurance termination provision provides that "[a]n employee will cease to be insured . . . [on] the date employment terminates . . . [unless] benefits are being paid."[29] Termination of Epes's insurance is proper because Epes is no longer employed by Kutak and his benefits have been properly terminated. Accordingly, Unum had no obligation to Epes after the termination of his benefits, so reinstatement and back benefits are unavailable to him. Summary judgment is DENIED on Defendant's claims for back benefits and reinstatement of benefits.

### B.     Unum's Claim for Reimbursement from Epes

### 1.     Limited Equitable Relief under ERISA

Unum seeks equitable restitution for its overpayments to Epes under 29 U.S.C. §1132(a)(3) of ERISA.[30] Epes argues that Unum's requests for equitable relief is not authorized by ERISA. I agree.

A fiduciary may bring a civil action under § 1132(a)(3) of ERISA "to obtain . . . appropriate equitable relief (i) to redress such violations [of this subchapter or the terms of the plan] or (ii) to enforce any provisions of this subchapter or the terms of the plan."[31] While the reference to "equitable relief" may seem broad, a line of cases from the Supreme Court has greatly narrowed the kind of relief available under ERISA.

---

[29]Doc. No. 21.

[30]Doc. No. 19.

[31]*Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006) (quoting 29 U.S.C. § 1132(a)(3)).

In *Mertens v. Hewitt Assocs*,[32] the Supreme Court held that the term "equitable relief" in 29 U.S.C. § 1132(a)(3) refers only to "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)."[33] Although the *Mertens* Court concluded that "equitable relief" included restitution, the Supreme Court later explained -- in *Great-West Life & Annuity Ins. Co. v. Knudson*[34] -- that only traditional "equitable" restitutionary *remedies* are available under ERISA.[35] The Court explained that, in order to give the term "equitable relief" meaning under the Act, courts must "limit restitution to the form of restitution traditionally available in equity before the merger of courts of law and equity."[36] Traditional forms of restitution in equity are constructive trusts or equitable liens on "particular funds or property in the defendant's possession."[37]

Finally, in *Sereboff v. Mid Atlantic Medical Services, Inc*,[38] the Court better explained the limits of equitable remedies available under ERISA. In *Sereboff*, an ERISA plan fiduciary sued beneficiaries for reimbursement of medical expenses paid by the plan when the beneficiaries settled with third-party tortfeasors for their injuries.[39] The health insurance plan had a detailed third-party reimbursement provision.[40] The Supreme Court held that the action to enforce the

---

[32] 508 U.S. 248 (1993).

[33] *Id*. at 255.

[34] 534 U.S. 204 (2002).

[35] *Id*. at 214.

[36] *Id*.

[37] *Id*.

[38] 547 U.S. 356 (2006).

[39] *Id*.

[40] *Id*.

third-party reimbursement provision was an equitable remedy under ERISA. The Court explained the limits of equitable restitution under ERISA by juxtaposing the *Sereboff* and *Knudson* facts:

> [*Knudson*] . . . involved facts similar to those in this case. Much like the "Acts of Third Parties" provision in the Sereboffs' plan, the plan in *Knudson* reserved "'a first lien upon any recovery, whether by settlement, judgment or otherwise,' that the beneficiary receives from [a] third party." After Knudson was involved in a car accident, Great-West paid medical bills on her behalf and, when she recovered in tort from a third party for her injuries, Great-West sought to collect from her for the medical bills it had paid.
>
> To decide whether the restitutionary relief sought by Great-West was equitable or legal, we examined cases and secondary legal materials to determine if the relief would have been equitable "[i]n the days of the divided bench." We explained that one feature of equitable restitution was that it sought to impose a constructive trust or equitable lien on "particular funds or property in the defendant's possession." That requirement was not met in *Knudson*, because "the funds to which petitioners claim[ed] an entitlement" were not in Knudson's possession, but had instead been placed in a "Special Needs Trust" under California law. The kind of relief Great-West sought, therefore, was "not equitable-the imposition of a constructive trust or equitable lien on particular property-but legal-the imposition of personal liability for the benefits that [Great-West] conferred upon [Knudson]." We accordingly determined that the suit could not proceed under [ERISA].
>
> That impediment to characterizing the relief in *Knudson* as equitable is not present here. As the [circuit court] explained below, in this case Mid Atlantic sought "specifically identifiable" funds that were "within the possession and control of the Sereboffs"-- that portion of the tort settlement due Mid Atlantic under the terms of the ERISA plan, set aside and "preserved [in the Sereboffs'] investment accounts." Unlike Great-West, Mid Atlantic did not simply seek "to impose personal liability . . . for a contractual obligation to pay money." It alleged breach of contract and sought money, to be sure, but it sought its recovery through a constructive trust or equitable lien on a specifically identified fund, not from the Sereboffs' assets generally, as would be the case with a contract action at law . . . . This Court in *Knudson* did not reject Great-West's suit out of hand because it alleged a breach of contract and sought money, but because Great-West did not seek to recover a particular fund from the defendant. Mid Atlantic does.[41]

Crucial to the Court's decision in *Sereboff*, then, was the fact that the fund sought by plaintiff was in the defendant's possession, and that the plan's third-party reimbursement provision created an

---

[41] 547 U.S. 356, 366 (2006).

equitable lien on that fund by "specifically identif[ying] a particular fund, distinct from the [beneficiaries'] general assets . . . and a particular share of that fund to which [the fiduciary] was entitled."[42]  Absent the reimbursement provision, then, the plaintiff would not have been entitled to restitution in equity.

In fine, when a plaintiff seeks equitable restitution under ERISA, the Supreme Court has squarely held: courts can grant relief only in the form of "restitution traditionally available in equity before the merger of courts of law and equity,"[43] including constructive trusts and equitable liens on specifically identified funds in the defendant's possession.

### 3. Unum Is Not Entitled to Equitable Relief Under ERISA

To determine whether the restitution sought is equitable and authorized under ERISA, a court must consider both "the basis for [the plaintiff's] claim and the nature of the underlying remedies sought."[44]  As for the first prong -- the basis for the plaintiff's claim -- a court must "ask whether the value of the harm done that forms the basis for the damages is measured by the loss to the plaintiff or the gain to the defendant."[45]  The basis of the plaintiff's claim must be to "punish[] the wrongdoer by taking his ill-gotten gains," whereas the basis of a legal claim "focus[es] on the plaintiff's losses."[46]  In other words, under the first prong, the court looks to the basis of the plaintiff's claim to determine whether the plaintiff is actually seeking relief on equitable grounds,

---

[42]*Id.*

[43]*Knudson*, 534 U.S. at 214.

[44]*Calhoon v. Trans World Airlines, Inc.*, 400 F.3d 593, 596 (8th Cir. 2005) (analyzing *Knudson*; internal citations and quotations omitted).

[45]*Id.*

[46]*Id.*

13

rather than legal relief dressed in equitable language. Here, Unum's claim does have an equitable basis -- that is, Unum paid Epes money to which he was not entitled under the Policy.

Even when a court determines that the basis of the plaintiff's claim is equitable, it must next look to "the nature of the underlying remedies sought."[47] This second prong is where Unum's claim fails, as the Supreme Court has greatly restricted equitable relief available under ERISA. Only when a court finds that the plaintiff may be granted a remedy in "a category of relief that was typically available in equity" in "the days of the divided bench" will relief be available under ERISA.[48]

Where equitable *restitution* is concerned, "[m]onetary damages that are compensatory in nature are traditionally considered to be legal relief," and courts "may not award restitution of a sum certain or find personal liability, both of which are impermissible legal remedies under section 1132(a)(3)."[49] Instead, when a plaintiff is seeking "monetary relief in the form of restitution [it] may be considered equitable only if it seek[s] not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."[50] For this reason, "constructive trusts and equitable liens are the most common forms of restitution in equity."[51] The money plaintiff seeks must be "specifically identifiable as belonging in good conscience to the plaintiff and . . . clearly . . . traced to particular funds or property in the defendant's possession."[52] As *Sereboff* made clear, equitable restitution may be

---

[47]*Id.*

[48]*Id.*

[49]*Calhoon*, 400 F.3d at 596.

[50]*Id.*

[51]*Id.*

[52]*Id.*

available when a plan contains a reimbursement provision sufficient to identify the particular funds in the defendant's possession.  But, "[w]here the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust or an equitable lien upon other property of the defendant."[53]

Unum's claim fails under this second prong because the money sought by Unum is not specifically identifiable, and cannot be clearly traced to particular funds or property in Epes's possession.[54]  And, the single reimbursement provision in the Policy relates only to reimbursement for overpayments of Social Security disability benefits.[55]  The Policy contains no reimbursement provision in the event of any other disbursement problem -- like the overpayments made to Epes.  As a result, Unum's claim amounts to a personal liability claim, and ERISA does not authorize "the essentially legal relief" Unum seeks.[56]

Although this case demonstrates the "'regulatory vacuum' created by ERISA's broad preemption of state law claims and the Supreme Court's narrow interpretation of 'other appropriate equitable relief,'" I am "bound by the precedent of this circuit and the Supreme Court."[57]

---

[53] *Knudson*, 534 U.S. at 214.

[54] Unum conceded this point at oral argument.

[55] Doc. No. 21.

[56] See *Knudson*, 534 U.S. at 220.

[57] *Pichoff v. QHG of Springdale*, 556 F.3d 728, 732 (8th Cir. 2009).

Summary judgment is DENIED on Plaintiff's claim for equitable relief to recover overpayments,[58] and GRANTED on Defendant's request for summary judgment on this issue.

## CONCLUSION

For the reasons set out above, I find that: (1) Epes's benefits were properly terminated; (2) Epes is no longer insured under the Policy; and (3) Unum is not entitled to recover any overpayment made to Epes.

Accordingly, Plaintiff's Motion for Summary Judgment (Doc. No. 18) is GRANTED IN PART (because Unum properly terminated Epes's benefits) and DENIED IN PART (because Unum is not entitled to the overpayments).

Defendant's Motion for Summary Judgment (Doc. No. 22) is GRANTED IN PART (because Unum is not entitled to the overpayments), and DENIED IN PART (because Epes is not entitled to reinstatement or back benefits).

As a result, I find for Defendant and against Plaintiff as to Plaintiff's Complaint, and for the Plaintiff and against Defendant as to Defendant's Counterclaim, and each is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED this 27th day of April, 2010.

/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[58] Because Unum is not entitled to any overpayments, I do not address the issue of whether Epes's benefits terminated on January 1, 2006.